UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                 )
FREDERICK PERRY,                 )
                                 )
          Petitioner,            )
                                 )
v.                               )        Civil Action No. 04-12529-RWZ
                                 )
LUIS SPENCER,                    )
                                 )
          Respondent.            )
_____)

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO
## THE PETITION FOR A WRIT OF HABEAS CORPUS

The respondent, through counsel, files this memorandum in opposition to the petition seeking a writ of habeas corpus. Not one of the many claims asserted by the petitioner presents this Court with a reason to grant habeas relief. The petitioner has procedurally defaulted a large number of these claims and can demonstrate neither cause and prejudice, nor actual innocence, to excuse his defaults. Furthermore, the state courts' decisions concerning his properly preserved claims were neither contrary to, nor unreasonable applications of, clearly established Supreme Court law. As such, the petitioner is not entitled to the extraordinary relief that habeas corpus provides and the petition should be denied.

## PRIOR PROCEEDINGS

On June 16, 1995, a Franklin County grand jury indicted the petitioner for the murder, kidnaping, and aggravated rape of Billy Paige. *See* Docket Sheets, part of respondent's Supplemental Answer, filed with this Court in April, 2005, attached at C [hereinafter cited as "Supp. Ans., ___"]. The petitioner's jury trial commenced on March 3, 1997, Welch, J.,

presiding. *Id*. The trial judge allowed the petitioner's motion for a required finding of not guilty as to the aggravated rape indictment. *Id*. On March 20, 1997, the jury convicted the petitioner both of first-degree murder, based upon a theory of extreme atrocity or cruelty, and of kidnaping, *id.*, and he was sentenced to the mandatory term of life in prison. *Id*. The petitioner filed a timely notice of appeal. *Id*.

The petitioner raised on direct appeal[1] the following issues: (1) the sufficiency of the evidence as to joint venture liability, principal liability, malice, proximate causation, and kidnaping; (2) the voluntariness of his confession; (3) the alleged violation of his right to an attorney during his interrogation; (4) the admission of his mother's (a co-venturer) hearsay statement; (5) exclusion of expert testimony concerning effects of prolonged marijuana use; and (6) the alleged violation of his right, as a matter of Massachusetts statute, to use the telephone during police questioning. On August 2, 2000, the Supreme Judicial Court ("SJC"), after reviewing these claims, as well as conducting plenary review under G.L. c. 278, § 33E, affirmed the petitioner's convictions. *Commonwealth v. Perry*, 432 Mass. 214, 733 N.E.2d 83 (2000); *see* Supp. Ans., G.

After his convictions were affirmed, the petitioner next filed a motion for new trial with the Superior Court on December 7, 2000. *See* Supp. Ans., H. Although the SJC had just ruled on petitioner's claims concerning sufficiency of the evidence, the admission of his mother's hearsay statement, and the exclusion of expert testimony regarding the effect of prolonged marijuana use, he raised these again in his new trial motion. *Id*. He also raised the following

---

[1] Petitioner was represented at trial by Janet Kenton-Walker, Esq. and on appeal by James L. Sultan, Esq.

newly minted claims: (1) ineffective assistance of trial counsel for (a) failing to call two witnesses who would have assisted petitioner's defense, (b) compelling petitioner to testify in violation of his right not to incriminate himself, (c) failing to request an instruction on juror unanimity, and (d) failure to raise petitioner's right to make a telephone call in his motion to suppress; (2) ineffective assistance of appellate counsel for failing to raise either trial counsel's alleged ineffectiveness or the denial of petitioner's motion to suppress physical evidence; (3) right to a fair trial violated by denial of petitioner's motion to suppress physical evidence; (4) prosecutorial misconduct in closing argument; (5) reversible error in trial court's denial of motion for mistrial and dismissal; (6) insufficiency of the bill of particulars as to particular dates and times when crime was committed; and (7) violation of right to impartial jury by trial court's failure to dismiss for cause two venire persons who allegedly wandered into the lockup area. *See* Supp. Ans., H.

The motion judge (Ford, J.), denied petitioner's motion for a new trial on November 27, 2001, finding that all the claims, save the one asserting ineffective assistance of appellate counsel, were waived as a matter of Massachusetts law. *See* Supp. Ans., I. As a result of petitioner's waiver, the court declined to consider them. Further, the trial court denied petitioner's ineffective assistance of appellate counsel claim, noting that petitioner failed "to make out even a remote case" of ineffectiveness. *Id*. The petitioner next filed an application seeking leave to appeal the trial court's ruling with a single justice of the SJC, as mandated by G.L. ch. 278, § 33E. In his application, he raised all the claims asserted in his motion for a new trial. *See* Supp. Ans., K, M, N. On October 5, 2004, the single justice (Spina, J.) refused petitioner's request to appeal, finding that petitioner had not met the required standard, namely

3

that only issues that were both "new" and "substantial" would warrant an appeal in these circumstances. *See* Supp. Ans., O ("The defendant's petition also fails to present any 'new and substantial question' warranting leave to appeal").

Petitioner next filed this action seeking habeas corpus relief on or about November 29, 2004. The petitioner filed his memorandum of law in support of his petition on August 15, 2005. The respondent now files this memorandum of law in opposition to the petition seeking a writ of habeas corpus.

## STATEMENT OF FACTS

"A 'determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)), *cert. denied*, 542 U.S. 933 (2004). "The 'presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact.'" *Id.* (quoting *Sumner v. Mata*, 455 U.S. 591, 593 (1982)).

### *Facts Concerning Billy Paige's Kidnaping and Murder*

The SJC set forth the following facts concerning petitioner's kidnaping and murder of Billy Paige, which petitioner does not dispute for purposes of obtaining habeas relief:

A. *The defendant's acts*. In the autumn of 1994, the victim and the [petitioner] traveled from Massachusetts to Arizona. The victim had attended special education classes and had participated in the Special Olympics. He was a talented cartoonist and the two men hoped to start a tattooing business. This enterprise never materialized, and, by December, the two returned to Massachusetts looking for a place to live.

The [petitioner] and the victim spent approximately ten days with a friend, Wendy Poirier, and her fiancé, Danny Nauman. At that time, the victim weighed

4

approximately 230 pounds.  Although the [petitioner] and the victim were friendly before the trip to Arizona, Poirier said that, by the time they moved in with Poirier, the [petitioner] "had become [verbally] abusive to [the victim], making very rude comments to him [and] calling him names."  Poirier observed the [petitioner] punch and push the victim several times.  According to Poirier, the victim "cower[ed] in the corner" in response to these beatings.  One day, Poirier observed the [petitioner] burn a cigar into the victim's forehead.[2]  Poirier then told the [petitioner] and the victim that both of them would have to leave.

The [petitioner] and the victim went to stay at the [petitioner's] mother's two-story family home.  Also residing at the home were the [petitioner's] three brothers, Leon, Richard, and Roger Perry.  The [petitioner's] mother and brothers were lessees of the home.  The [petitioner] was not a signatory on the lease.

During the second week of December, Frank Parker, who did not know the Perrys, was with friends of the Perry family.  The group stopped at the [petitioner's] mother's home.  The [petitioner], the [petitioner's] mother, Richard, and Roger were present.  The [petitioner] called the victim, who was on the second floor, to come downstairs.  The [petitioner] asked the group whether they wanted to "see something funny."  According to Parker, the victim "looked like he had been beaten before."  Parker said that the [petitioner] delivered several "[c]losed fisted punch[es] to the [victim's] temple."  The victim begged the [petitioner] to stop the beating.  After several punches, the [petitioner] told the victim to go upstairs, which the victim did.

Throughout December, 1994, a number of individuals witnessed other incidents at the [petitioner's] mother's house.  A friend of the [petitioner], Michelle King, saw the [petitioner] and Nauman roughhousing with the victim.  King said that this behavior escalated until the [petitioner] was "punching at [the victim] and ... shaking him around."

On another occasion in December, 1994, King, Poirier, Nauman, and the [petitioner] were talking.  Poirier and Nauman hinted to the [petitioner] that the victim had betrayed some confidence of the [petitioner].  Both the [petitioner] and the victim were wanted by the police on outstanding warrants, and the [petitioner] was concerned that the victim might betray him.  The next day, King observed

---

[2]The SJC added the following in a footnote:

"Poirier's testimony was admitted for the limited purpose of showing the nature of the relationship and any pattern of behavior between the [petitioner] and the victim."

that the victim's "face was bruised" and "swelled out, [and] all sorts of different colors."

By Christmas, the victim, who, according to Poirier, had been "a very outgoing person," had become "very quiet and withdrawn." Around Christmas time, Laura White, another acquaintance of the Perry family, noticed that the victim's tongue was burned. The [petitioner] told her that "they held [the victim] down on the kitchen floor and put a butter knife in the flames of the gas fire, and burnt [the victim] with it."

By the end of December, White, who had taken courses with a view toward becoming a licensed practical nurse, noticed that the victim had "several burns on his arms" and that "he had been beaten....[H]e had a black eye and his face was a little swollen." She treated the victim's burns with salve. The [petitioner] told White that the victim also had a burn on his penis. Poirier, who saw the victim at the end of December, noticed through the victim's shirt that the victim also had a large burn on his shoulder.

During the second week of January, 1995, Frank Parker once again accompanied friends who stopped by the [petitioner's] mother's home. The [petitioner's] brothers, his mother, and his cousin, Clinton Maynard, all were present. Maynard was beating the victim by "slamm[ing]" the victim's neck first onto the the floor. The [petitioner] joined Maynard and each of them took turns beating the victim. One of the two men held the victim so as to keep his neck exposed, and the other man used his outstretched arm to hit the victim across the neck. The [petitioner] used his arm, which was in a brace, to beat the victim across the neck. The victim begged the two men to stop. According to Parker, the beating continued for "a good half hour to [forty five] minutes."

Parker also said that, on this occasion, the [petitioner] and Maynard placed keys between their fingers and raked the keys across the victim's head so as "to draw blood and rip his scalp open." In addition, the [petitioner] used a bicycle chain wrapped in tape as "brass knuckles," punching the victim above the left eye and opening a wound approximately one inch around.

That evening, Parker also saw the [petitioner] and Maynard take the victim into the bathroom, where they scrubbed him with household cleaners. The victim was screaming, while the [petitioner] and Maynard laughed. When the victim came out of the bathroom, he had cuts and bruises all over his face. During one of Parker's two visits to the [petitioner's] mother's home, the [petitioner] told Parker that, if Parker went to the police, he (Parker) would "end up floating in the river and nobody would be able to do anything about it."

On February 14, 1995, White, who had treated the victim's burns in December, again visited the [petitioner's] mother's home and asked to see the victim. The [petitioner] went upstairs and returned with the victim. White observed that the victim "had been beaten severely." According to White, "[h]is face was swollen almost to a pumpkin size. It was purple. His ... left eye was almost completely swollen shut.... His jaw looked ... [n]ot centered on his face." The victim's arm appeared to be broken because it was "pulled in and kind of twisted down." There was blood coming from the victim's ears, nose, and the side of his mouth. His hands were tied, and he smelled as if he had not showered for some time. White also noted that the victim appeared to have lost a significant amount of weight. White asked the [petitioner] if she could look at the victim's arm. The [petitioner] said, "No."

In February or March of 1995, Melissa Terry, another acquaintance of the Perry family, visited the [petitioner's] mother's home. The victim, who typically was upstairs during Terry's visits, called downstairs, saying that he was naked and had to go to the bathroom. Terry testified that the [petitioner's] mother shouted back, "I'm not in charge of you" and that "Freddy [the [petitioner]] was."[] The victim attempted to come down the stairs. The [petitioner], Roger, and Maynard chased the victim back up the stairs. Terry heard a "bunch of noise" and then heard the victim crying and saying that he was bleeding. This went on for ten to fifteen minutes, during which time Terry heard the men "laughing, like it was real funny to them." That night, the police came to the [petitioner's] mother's home looking for the [petitioner] and the victim. According to Terry, the [petitioner's] mother told the police that the two men were still in Arizona.

White also testified that, on one of her visits to the [petitioner's] mother's household, the victim "was beaten" and his wrists were tied up so as to force him to hold a coffee can in his hands. The [petitioner] used the coffee can as a tobacco spittoon, occasionally missing the can and spitting on the victim. When some amount of liquid had accumulated in the can, the [petitioner] forced the victim to drink it, which caused the victim to vomit. The [petitioner] repeated this process several times while White was present. The victim asked to call his mother, but the [petitioner] told him, "No." On one of her visits to the Perry household, White told the [petitioner] that "if he kept beating [the victim] like that, that [the victim] was going to die."

B. *The [petitioner's] confession.*[] During the Commonwealth's presentation of evidence State police troopers Francis Hart and Thomas Nartowicz testified to the contents of the [petitioner's] oral and written confessions. Although the [petitioner] attempted to place the primary culpability on Maynard and Nauman, the [petitioner] described beating the victim and noted that, at one point, the victim's "face was all busted up and he couldn't eat." The [petitioner] admitted

that he "beat [the victim] pretty good a few times" and "kicked him with [his] work boots probably more than [he] should have." The [petitioner] also admitted to hitting the victim with a "club of wood" and with "dumbbell bars." When the troopers asked the [petitioner] about his and Maynard's reactions to the beatings, the [petitioner] responded that "they laughed a few times."

The [petitioner] told the police that Maynard "tied and gagged [the victim] to the weight bench, and that [the victim] was gagged several times." The [petitioner] also admitted that he administered electric shocks to the victim using a frayed electrical cord.[3] The [petitioner] claimed that, although Maynard initiated this incident, they "all had to try that, because [Maynard] said it was fun."

The [petitioner] told the troopers that he had been aware that the victim was losing weight. According to the [petitioner], the victim died toward the end of March or beginning of April, 1995. Before the victim died, the [petitioner] also noticed that the victim "was pretty weak." The [petitioner] admitted to the police that he "slapped" the victim on the evening on which, according to the [petitioner], the victim died. The [petitioner] claimed that he also heard Maynard "slap" the victim later that evening.

When the [petitioner] discovered the victim had died, he, his brothers Richard and Roger, and Maynard took the body, wrapped it in a blanket, and secured it with coat hangers. They put the body in the back of a van, along with weights, a cement block, and an old vise, to weight the body down. They then drove the body to a quarry in New Hampshire which appeared "pretty deep" and left the body there.

C. *Physical evidence.* The body was discovered in a shallow pool in a New Hampshire quarry on May 23, 1995. The body was wrapped in blankets, with weights and other heavy objects attached, as the [petitioner] described in his confession. The body had deteriorated significantly because of the damp conditions, but the medical examiner was able to determine that the victim suffered the following injuries while still alive: a fractured jaw resulting from a "very, very powerful blow to the face"; a bruise with a laceration around the mouth; a bruise on the cheek; two black eyes; considerable bruising of the lower extremities; blunt force trauma to the knees; bruising from blunt force injury to the buttocks; considerable bruising on the arms suggesting that the victim "was trying to fend off blows"; fractured bones in the left hand, resulting from

---

[3]The SJC added the following in a footnote:

"The Commonwealth presented the testimony of an electrician who stated that such electric shocks are 'extremely painful.'"

"crushing blunt force"; and a portion of skin removed from part of his back. The medical examiner could not ascertain whether a number of additional injuries had been inflicted antemortem or post mortem, including two scalp irregularities, one of which was consistent with being scraped with a key; a "flaying wound" or, in popular parlance, a partial "scalping"; blunt force trauma to one foot and the partial amputation of at least one finger.

The medical examiner noted that the victim would have had difficulty chewing food with the jaw injury. Based on the medical examiner's estimation of the victim's weight at the time of death, the victim had lost approximately one hundred pounds between December, 1994, when the beatings began, and his death. The medical examiner could not determine with certainty the final act that caused the victim's death, but his testimony was that the cumulative effect of the beatings and starvation led to the victim's death.

In addition to medical testimony, the jurors heard the testimony of police officers who searched the house at which the beatings of the victim took place, as well as the house to which the Perrys moved shortly thereafter. The police found bloodstains on the wallpaper and floor of an upstairs bedroom, bloodstained scissors, weights, and an electrical cord with severed ends.

*Commonwealth v. Perry*, 432 Mass. at 215-221, 733 N.E.2d at 88-92.

### **Facts Concerning the Voluntariness of Petitioner's Statements**

The SJC summarized the factual findings, as made by the trial judge in denying the

petitioner's motion to suppress his statements, as follows:

The judge's findings and the record reveal the following facts. Troopers Hart and Nartowicz were ordered to question the [petitioner] because information was received indicating that the [petitioner] was involved in the murder of the victim. At that time, the [petitioner] was in custody at a house of correction on an unrelated matter. The troopers arrived at the house of correction at approximately 3 A.M. and requested that the [petitioner] be produced for questioning.[4] The

---

[4]The SJC added the following in a footnote:

"The time of the interview does not appear to have been a calculated tactic on the part of the troopers. The troopers spent the evening and early morning hours questioning a number of individuals, including other members of the Perry family, who implicated the [petitioner] in the death of the victim. After consulting with their commanding officer, the troopers were instructed to proceed to the house of

[petitioner] was brought to a room used by correction personnel as a lunch break room. The troopers read the [petitioner] the Miranda warnings; the [petitioner] read the warnings to himself; and the [petitioner] signed a waiver indicating that he was willing to answer the troopers' questions. Over the course of three hours, the [petitioner] was questioned orally and subsequently wrote out a statement. The [petitioner] was seated at a table with the two troopers and was given cups of coffee. When the [petitioner] needed to use the restroom, he was escorted to the appropriate facilities. The [petitioner] was calm and cooperative, but showed little emotion through the course of the interview. When the [petitioner] returned to his cell, the troopers requested that the correction officers prevent the [petitioner] from using a telephone possibly to communicate with Maynard or other suspects.

. . . .

The judge found "beyond a reasonable doubt . . . that [the [petitioner]] never requested an attorney." The judge noted that his finding "is supported by the wholly credible testimony of Officers Hart and Nartowicz."

*Commonwealth v. Perry*, 432 Mass. at 232, 233, 733 N.E.2d at 99-100.

## ARGUMENT

I.   **THE SJC'S DETERMINATIONS CONCERNING THE SUFFICIENCY OF THE EVIDENCE, THE PETITIONER'S STATEMENTS, THE ADMISSIBILITY OF PETITIONER'S MOTHER'S HEARSAY STATEMENT, AND THE EXCLUSION OF EXPERT TESTIMONY WAS NEITHER CONTRARY TO, NOR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW.**

Because this petition was filed after the effective date of the Antiterrorism and Effective

Death Penalty Act ("AEDPA"), this Court's review is governed by its provisions. *Lindh v.*

*Murphy*, 521 U.S. 320, 336 (1997). "AEDPA provides that, when a habeas petitioner's claim has

been adjudicated on the merits in state-court proceedings, a federal court may not grant relief

unless the state court's adjudication of the claim 'resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

_____

correction to question the [petitioner]."

Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1)[,]" *Brown v. Payton*, 544 U.S. __,

125 S. Ct. 1432, 1438 (2005), or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28

U.S.C. § 2254(d)(2).[5]

 "A state-court decision is contrary to [the Supreme Court's] clearly established

precedents if it applied a rule that contradicts the governing law set forth in [Supreme Court]

cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the

Supreme Court] but reaches a different result. *Williams v. Taylor*, [529 U.S. 362 (2000)]; *Early

v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court decision involves an unreasonable

application of [the Supreme] Court's precedents if the state court applies [the] Court's precedents

to the facts in an objectively unreasonable manner. *Williams v. Taylor*, [529 U.S.] at 405;

*Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)." *Brown*, 125 S. Ct. At 1438-39.

 There is no bright line rule as to what constitutes an "objectively unreasonable"

application of established Supreme Court precedent. *Williams*, 529 U.S. at 410. As the *Williams*

decision makes clear, however, an unreasonable state-court determination is not the equivalent of

an incorrect one. *Id*.

> Indeed, because Congress used the word "unreasonable" . . ., and not words like
> "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply
> because the court concludes in its independent judgment that the relevant state-
> court decision applied clearly established federal law erroneously or incorrectly.
> Rather, that application must also be unreasonable.

---

[5]All of petitioner's claims appear to be based upon his assertion that the state courts'
decisions contravened or misapplied Supreme Court law, 28 U.S.C. s. 2254(d)(1), and do not
appear to challenge as unreasonable the state courts' determination of the facts, 28 U.S.C. §
2254(d)(2).

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1ˢᵗ Cir.) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 534

U.S.

925 (2001).  *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1ˢᵗ Cir. 2001), *cert. denied*, 535 U.S. 960

(2002) (under AEDPA's "broad objective standard, a federal court cannot grant habeas relief

simply because it disagrees with or finds error in the state court's application of federal law").

In addition, under the AEDPA, a state court's determination of the facts presented in the

state court proceedings are presumed to be correct.  *Miller-El v. Dretke*, 545 U.S. ___, 125 S. Ct.

2317, 2325 (2005).  Nevertheless, a habeas corpus petitioner may rebut this "'presumption of

correctness by clear and convincing evidence.'"  *Id.* (quoting 28 U.S.C. § 2254(e)(1)).  "The

standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'"

*Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A.    **The SJC's Determination That the Evidence Was Amply Sufficient to Convict Petitioner of Both First-Degree Murder and Kidnaping Neither Contravened Nor Unreasonably Applied Supreme Court Precedent.**

The petitioner's numerous challenges to the sufficiency of the Commonwealth's evidence

were rejected by the SJC in a lengthy and correct analysis of both constitutional principles and

Massachusetts criminal law.  As a result, the petitioner's habeas claim fails.  Specifically, the

petitioner claimed the evidence was insufficient to convict him of first-degree murder either as a

principle or joint venturer; he also challenged the sufficiency of the evidence that the joint

venturers' acts proximately caused the victim's death.  He further asserted that the

Commonwealth adduced insufficient evidence of malice to support a murder conviction.  Finally,

he claimed that the Commonwealth's evidence was insufficient to support a conviction for

kidnaping.

12

The SJC began its analysis of these claims by setting forth the well-known standard governing sufficiency claims: "'[T]he question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' [emphasis in original omitted]. *Commonwealth v. Latimore*, [378 Mass. 671, 677, 393 N.E.2d 370 (1979)], quoting *Jackson v. Virginia*, 443 U.S. 307, 318-319 [] (1979)." Because the SJC recognized and articulated the appropriate Federal standard, the "contrary to" prong of 2254(d)(1) does not apply where it constitutes "'a run-of-the-mill state-court decision applying the correct legal rule from [the Supreme Court's] cases to the facts of a prisoner's case.'" *Hurtado v. Tucker*, 245 F.3d at 15 (quoting *Williams v. Taylor*, 529 U.S. at 406). Instead, the pertinent question is whether the SJC's decision can be considered objectively unreasonable, a determination that requires the state court's decision to be more than simply incorrect. *Id.*

### a. *Sufficiency of evidence of malice.*

The SJC first tackled the petitioner's contention that the Commonwealth did not present sufficient evidence of malice. The court set forth Massachusetts' definition of malice: "'Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim. Malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act.'" *Commonwealth v. Perry*, 432 Mass. at 222, 733 N.E.2d at 93. The SJC enumerated the following evidence of the petitioner's malice: (1) petitioner's use of deadly weapons in beating and electrocuting the victim; (2) Laura White's statement to petitioner that "'if he kept beating

13

[the victim] like that, that [the victim] was going to die.'"; and (3) petitioner's knowledge that his actions were criminal as demonstrated by his statement to an eyewitness to the beatings that if the witness told the police, the witness would "'end up floating in the river and nobody would be able to do anything about it.'" *Id*.

### b. Sufficiency of evidence of joint venture and proximate cause.

Next, the state court addressed the petitioner's claim that the evidence of joint venture liability was insufficient and that the evidence was insufficient to demonstrate that the joint venturers' acts proximately caused the victim's death. In concluding that the evidence was amply sufficient to demonstrate that the petitioner knew about, participated in, and rendered aid to the joint venture, the SJC noted the following evidence:

> Witnesses saw the [petitioner] act in concert with Maynard and others–taking turns holding and beating the victim. The [petitioner] participated with Maynard in electrocuting the victim. The evidence also showed that, when outsiders came into the [petitioner's] mother's house, various members of the family would block the opening to the area of the house where the victim was kept. The [petitioner] assisted his brothers and Maynard in disposing of the body. Evidence that the [petitioner] assisted in "avoid[ing] detection and detention" and "attempt[ed] actively to conceal evidence" warrants the inference that he continued to be involved in the joint venture. [Citation omitted.]

*Commonwealth v. Perry*, 432 Mass. at 223-24, 733 N.E.2d at 94.

The SJC noted the following evidence from which the jury could have concluded that the joint venturers' brutal actions over the course of months proximately caused the victim's death:

> The evidence suggested several causes of death. The cause of death was listed on the death certificate as multiple blunt and sharp force injuries applied over time, to the head, torso, and extremities. The medical examiner said that, after completing his inquiry into the cause of death, his "supposition" was that the victim "died of lung infection [which was] a direct consequence of the stress, pain, inability to eat and other factors, including hemorrhage, as a final, overall effect of all of those injuries." The medical examiner also said that some of the wounds, if left untreated, could have caused the victim's death.

14

> The evidence showed that the [petitioner] and his coventurers participated in
> repeated and severe beatings of the victim, often applying potentially deadly force;
> that the [petitioner] participated in the incident during which the victim's tongue
> was burned with a butter knife; and that the [petitioner] and Maynard repeatedly
> hit the victim across the neck.  These facts warrant the inference that the
> [petitioner] and his coventurers caused blunt force trauma to the victim, caused
> the victim's inability to eat, and caused the victim to experience "stress" and
> "pain."  Because the foregoing were cited by the medical examiner as causes of
> the victim's death, the evidence sufficed to permit the jurors to determine whether
> the [petitioner], as a participant in a joint venture, caused the victim's death.

*Commonwealth v. Perry*, 432 Mass. at 224, 733 N.E.2d at 94.  The SJC also rejected, as a matter

of Massachusetts law, the petitioner's argument that because the medical examiner opined that

the victim may have died from pneumonia, proximate causation did not exist:  "[w]here a

defendant causes an injury which, along with other contributing factors or medical sequella of the

injury, leads to death, jurors may determine that the defendant's acts were the proximate cause of

the injury."  *Id*. at 225, 733 N.E.2d at 95 (citations omitted).

The court additionally rejected, also as a matter of Massachusetts law, the petitioner's

assertion that the Commonwealth was required to prove that a particular beating or beatings

caused the victim's death.  Contrary to the petitioner's assertion, under Massachusetts law "the

acts constituting the crime were the multiple abuses and beatings which had the cumulative effect

of causing the victim's death."  *Id*.

### c.  *Sufficiency of evidence of individual liability.*

The SJC, in rejecting the petitioner's claim that the evidence did not suffice to hold him

liable as an individual for the first-degree murder of the victim, noted the following evidence:

> The [petitioner's] use of deadly weapons in beating and electrocuting the victim,
> along with the medical examiner's testimony as to the cause of death, suffice for
> the jurors to conclude that the [petitioner's] acts caused the death of the victim.
> The [petitioner] told police that he kicked the victim with  his work boots "more
> than [he] should have."  The [petitioner] beat the victim with a "club of wood"

> and with "dumbbell bars," applied electric shocks to the victim, used his arm, which was in a brace, to hit the victim full across the neck, and hit the victim in the head with a bicycle chain wrapped in tape. The [petitioner] slapped the weakened victim on the night he died. These acts also support the conclusion that the [petitioner's] acts caused the victim's death.

*Commonwealth v. Perry*, 432 Mass. at 226-27, 733 N.E.2d at 96. As part of its conclusion, the SJC also rejected, as a matter of Massachusetts law, the petitioner's legal argument concerning the intervening acts of other individuals: "'[i]ntervening conduct that is reasonably foreseeable will not relieve the defendant of criminal responsibility.'" *Id*. at 227, 733 N.E.2d at 96. Because the petitioner was "well aware of what was happening and participated in most of the beatings" he could not escape responsibility by claiming others' actions superseded his liability. *Id*.

The SJC also rejected the petitioner's contention that the evidence "'tend[ed] equally to sustain either of two inconsistent propositions[,]'" which made legitimate proof of either impossible. *Id*. at 229, 733 N.E.2d at 97. In so doing, it noted that "the Commonwealth's evidence showed that the victim's death was caused by the cumulative effect of the multiple beatings, many of which the [petitioner] perpetrated. The evidence linked the [petitioner's] acts to the factors cited by the medical examiner as causing the victim's death." *Commonwealth v. Perry*, 432 Mass. at 229, 733 N.E.2d at 229. Finally, the SJC also rejected the petitioner's claim that there was no evidence that he participated in any beatings in the last months before the victim's death. The court noted that: (1) petitioner did not indicate in his statement to police that he had changed his behavior toward the victim at any point; (2) petitioner slapped the victim on the night he died; and (3) he assisted in actively concealing the body. *Id*. at 229-30, 733 N.E.2d at 98.

### d. *Sufficiency of evidence of kidnaping.*

The SJC determined that, contrary to the petitioner's assertions, the evidence supported

his conviction for kidnaping, on either a joint venture or individual liability theory. In so doing,

the court made note of the following evidence:

> The evidence showed that the [petitioner] knew that Maynard tied and gagged the victim to a weight bench. When visitors came to the [petitioner's] mother's house, the [petitioner] or his brothers would stand blocking the entry to the stairs to the floor on which the victim was being held. One evening, when the [petitioner] and his brothers were leaving the house for the evening, a witness heard either the [petitioner] or his brother Roger say that "they" had the victim gagged and tied. The [petitioner] told the victim that "he wasn't allowed to go near the windows or outside." The [petitioner] would not allow the victim to come downstairs. During the incident with the tobacco juice, in which the [petitioner] was the principal participant, the victim's hands and feet were bound. When the victim asked to be able to call his mother, the [petitioner] said, "No."[6]

*Commonwealth v. Perry*, 432 Mass. at 231, 733 N.E.2d at 99. Under Massachusetts law, "[a]

person is guilty of kidnaping if he or she 'without lawful authority, forcibly or secretly confines

---

[6]The SJC added the following in a footnote:

"The facts listed in note 16, infra, also support the inference that the [petitioner] controlled the victim's movements."

The SJC detailed the following facts in footnote 16:

"[I]mmediately after the [petitioner's] mother said that the [petitioner] was in charge of the victim, the [petitioner] told the victim to go back upstairs. Parker testified that, when he was at the [petitioner's] mother's home, it was the [petitioner] who called the victim downstairs, beat the victim, and sent the victim upstairs. Laura White asked to see the victim in February and the [petitioner] brought him downstairs. When White asked to look at the victim's arm, the [petitioner] said no. The [petitioner] told the victim he could not telephone his mother. The [petitioner] also told the victim to tell White that the [petitioner] had made him 'give Johnny [Maynard] a blow job.' The [petitioner] laughed and said he made the victim do it."

or imprisons another person within this commonwealth.'  G.L. c. 265, § 26.  Given that

definition, the SJC appropriately rejected this sufficiency claim.

 The Commonwealth's evidence that the petitioner, along with others, held the victim

against his will and committed atrocious acts of violence over the course of months that

inexorably led to the victim's painful death, all as detailed above, was overwhelming.  Nothing

about the SJC's consideration of the sufficiency of that evidence could lead to a conclusion that

its decision was objectively unreasonable.  Habeas relief should be denied.

**B.**     **The SJC's Determination That The Trial Court Appropriately Denied Petitioner's Motion to Suppress His Statements Was Not Objectively Unreasonable Given Applicable Supreme Court Precedent.**

**1.**     **The trial court's factual determination that petitioner never asked for an attorney conclusively resolves against him that aspect of his voluntariness claim.**

 The petitioner's claim that his *Miranda* rights were violated because the interrogation

continued after he asked for an attorney is easily dispensed with given the trial court's findings.

Specifically, after conducting an evidentiary hearing on this matter, at which the petitioner and

the officers testified, the trial court determined:

> I find beyond a reasonable doubt, however, that Mr. Perry never requested an attorney.  This finding is supported by the wholly credible testimony of Officers Hart and Nartowicz.  The fact that [petitioner] hand wrote a five page statement detailing his involvement in the death of Billy Paige after signing the waiver form further supports this finding.

> Paragraph five of the waiver form reads in relevant part:  "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer."  Thus, [petitioner] was fully aware that he could have discontinued speaking to the police upon requesting an attorney.  Instead, [petitioner] wrote out the above discussed five page statement.

18

*See* Supp. Ans., C, at page 89.  The SJC upheld the trial court's denial of the petitioner's motion
to suppress on this ground, stating:  "[w]e accept the judge's findings.  The question of
credibility is for the trial judge."  *Commonwealth v. Perry*, 432 Mass. at 233, 733 N.E.2d at 100.
That same deference to the trial judge's credibility determinations is applied on habeas review.
*See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be
presumed to be correct).  Petitioner does not, and cannot, rebut these presumptively correct
factual findings by clear and convincing evidence.  *Id*. ("[t]he applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing evidence").  Habeas relief must
be denied.

> **2.      The state courts' determination that petitioner's statements were
> voluntarily given falls comfortably within applicable Supreme
> Court precedent.**

The petitioner's claim that the SJC unreasonably determined that his statements to the
police were voluntary necessarily fails when one measures the SJC's decision against the clearly
established Federal law governing the claim.  Clearly established Supreme Court precedent holds
that in determining whether testimonial evidence supplied by a defendant was voluntary, a court
must ask whether, under the totality of the circumstances, law enforcement officials obtained the
evidence by overbearing the will of the accused.  *See Haynes v. Washington*, 373 U.S. 503, 513-
14 (1963).  This factual inquiry centers upon (1) the conduct of law enforcement officials in
creating pressure and (2) the suspect's capacity to resist that pressure.  *See Mincey v. Arizona*,
437 U.S. 385, 399-401 (1978).  In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme
Court emphasized that coercion by a state actor is a necessary element in satisfying this test.  *Id*.
at 164.

Among the factors courts commonly consider in assessing the totality of circumstances surrounding the voluntariness determination are: (1) the circumstances surrounding the detention, including its length, location and continuity, and (2) whether *Miranda* warnings were given. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). An accused's personal characteristics, such as his or her maturity, education, physical condition and mental health are also factors in the totality test, *id.*, but are not individually sufficient to render a confession involuntary. *See Procunier v. Atchley*, 400 U.S. 446, 453-54 (1971); *United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir.), *cert. denied*, 530 U.S. 1281 (2000). Also, while the giving of *Miranda* rights does not by itself "dispense with the voluntariness inquiry," it nevertheless is a highly relevant fact. *Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Frazier v. Cupp*, 394 U.S. 731, 731 (1969). Indeed, the "'cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Dickerson*, 530 U.S. at 444 (quoting *Berkemer v. McCarthy*, 468 U.S. 420, 433 (1984)).

The petitioner asserted that his statements were involuntary due to his alleged mental illness. Consonant with Federal law, the trial court recognized that the question of voluntariness must be measured by "the totality of the circumstances surrounding defendant's statement." *See* Supp. Ans., C, at page 89. While the trial court cited to state cases, those cases in turn cited to applicable Supreme Court law governing voluntariness. As such, the state court's analysis should be entitled to deference under the AEDPA. *Cf. DiBenedetto v. Hall*, 272 F.3d 1, 6 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002) (*de novo* review when "the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with

federal constitutional issues)").  The trial court further recognized that the petitioner's mental condition was an important factor in this analysis:  "as defendant has raised the issue of his mental condition at the time he made the alleged statements to police, the court must determine whether these statements were the 'product of a rational intellect as part of the issue of voluntariness.'"  *Id.* at 90 (quoting *Commonwealth v. Johnston*, 373 Mass. 21, 25 (1977)).  The trial court concluded beyond a reasonable doubt that the petitioner's statements were voluntary, after considering the testimony of the petitioner, as well as experts for both petitioner and the Commonwealth.  *Id.*  It focused on the following salient facts:  (1) the petitioner's own expert testified that petitioner was "fully capable of voluntarily, intelligently, and knowingly waiving his rights at the outset of police questioning[,]" *id.*; (2) the prosecution's expert credibly rebutted petitioner's expert's opinion that testing results indicated that petitioner's ability to make free and voluntary responses deteriorated during the course of questioning, *id.* at 90-91; and (3) the petitioner's prior experience with the criminal justice system, about which the court noted, "during two of defendant's previous brushes with the criminal justice system, he declined to give police a statement after being informed of his *Miranda* rights.  *Id.* at 91.

> As the SJC summarized the trial court's findings:
>
> [T]he judge found that the [petitioner's] "statement was chronological and coherent and to a large extent exculpatory in minimizing [the [petitioner's]] role in the beatings"; that the [petitioner] understood his rights and had the capacity to exercise those rights; and that the psychologist's "testimony regarding the [test's] inability to retroactively determine an individual's mental state [was] particularly credible."

*Commonwealth v. Perry*, 432 Mass. at 234, 733 N.E.2d at 101; *see* Supp. Ans., C, at pages 83-92.  Because the trial court's factual findings were supported by the record, the SJC declined to substitute its own assessment of the evidence.  *Id.*  On habeas review, the federal court is bound

21

by the same principles: "a federal habeas court has 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them,' and must 'more than simply disagree with the state court' to reach a different result." *Caldwell v. Murphy*, 159 F.3d 639, 650 (1ˢᵗ Cir. 1998), *cert. denied*, 526 U.S. 1009 (1999) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 432-34 (1983)); *see Mastracchio v. Vose*, 274 F.3d 590, 598 (1ˢᵗ Cir. 2001); *Sanna v. DiPaolo*, 265 F.3d 1, 10 (1ˢᵗ Cir. 2001).

Given the state court's factual determinations, habeas relief cannot lie. Further, nothing about the state court's application of law to the facts as found could be viewed as objectively unreasonable. The trial court carefully considered all the facts and circumstances in measuring voluntariness. Consonant with applicable Supreme Court law, it correctly noted that the petitioner was provided with the *Miranda* warnings. *Dickerson v. United States*, 530 U.S. at 444. Further, the court took note of the fact that this was the fifth occasion on which the petitioner received such warnings, and that on two of those prior occasions he declined to speak to the police. *See* Supp. Ans., C, at 84. Habeas relief should be denied.

### C.    The SJC's Determination That Petitioner's Mother's Hearsay Statement Correctly Was Admitted As a Statement of a Co-Venturer Did Not Implicate Petitioner's Confrontation Clause Rights.

Because the petitioner's mother's hearsay statement – that the petitioner was in charge of the victim -- was properly admitted as a matter of Massachusetts evidentiary law, the petitioner's claim that his Confrontation Clause rights were violated necessarily fails.[7]  Under applicable

---

[7] The Supreme Court recently altered the landscape of Confrontation Clause jurisprudence with its decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). The First Circuit has bypassed the question of whether Crawford is to be applied retroactively for habeas purposes. *See Horton v. Allen*, 370 F.3d 75, 83 (1st Cir. 2004), *cert. denied*, 125 S. Ct. 971 (2005). As in *Horton*, however, the question is not pertinent here because Lena Perry's

Supreme Court precedent, the hearsay statement of an unavailable declarant is constitutionally

permissible so long as "the statement 'falls within a firmly rooted hearsay exception' or

otherwise bears particularized guarantees of trustworthiness." *Horton v. Allen*, 370 F.3d 75, 84

(1st Cir. 2004) (quoting *Ohio v. Roberts*, 448 U.S. 56, 83 (1980)), *cert. denied*, 125 S. Ct. 971

(2005). As the SJC determined, Lena Perry's statement was admitted as a statement of a co-

venturer, a well established hearsay exception under Massachusetts law:

> The extrajudicial statement of a coventurer is admissible if the statement is made
> during the pendency of the joint venture and in furtherance of its goal.
> *Commonwealth v. Colon-Cruz*, 408 Mass. 533, 543, 562 N.E.2d 797 (1990).
> *Commonwealth v. White*, 370 Mass. 703, 708-709, 352 N.E.2d 904 (1976)....To
> be a coventurer, Lena Perry must have been "[1] present at the scene of the crime,
> [2] with knowledge that another intended to commit a crime, and [3] by
> agreement was willing and available to help the other if necessary."
> *Commonwealth v. Semedo*, 422 Mass. 716, 719, 665 N.E.2d 638 (1996).

*Commonwealth v. Perry*, 432 Mass. at 234-35, 733 N.E.2d at 101. This analysis fully comports

with applicable Supreme Court precedent that requires that both that the declarant be unavailable

and that the exception be "firmly rooted." *Ohio v. Roberts*, 448 U.S. at 83.

First, Lena Perry, as a co-venturer who faced charges in connection with the victim's

kidnaping and murder, was unavailable to testify. Further, this hearsay exception is firmly rooted

as a matter of Massachusetts evidentiary law. Such an exception is firmly rooted if, "'in light of

longstanding judicial and legislative experience [the exception] rests on such a solid foundation

---

statement, that the petitioner was in charge of Billy Paige, was not testimonial. As the First
Circuit has interpreted *Crawford*, testimonial statements are those that qualify as "ex-parte in-
court testimony or its equivalent; ... formalized documents such as affidavits, depositions, or
prior testimony transcripts; ... [or] [statements] made as part of a confession resulting from
custodial examination." *Horton*, 370 F.3d at 84. *Crawford*'s holding applies only to testimonial
statements. *Crawford*, 124 S. Ct. at 1374. As the Court noted, consideration of the admission of
nontestimonial statements continues to be governed by *Ohio v. Roberts*, 448 U.S. 56 (1980).

that admission of virtually any evidence within it comports with the substance of the

constitutional protection.'" *Horton*, 370 F.3d at 85 (quoting *Lilly v. Virginia*, 527 U.S. 116, 126

(1999)).  This hearsay exception has been recognized by the SJC for well over one hundred years.

*See Commonwealth v. Brown*, 14 Gray, 419, 432 (1860).  The exception is premised on a belief

that "[t]he community of activities and interests which exists among the coventurers during the

enterprise tends in some degree to assure that their statements about one another will be

minimally reliable." *Commonwealth v. White*, 370 Mass. 703, 708-709, 712 (1976).  Because the

statement was admitted in complete conformance with applicable Confrontation Clause

jurisprudence, habeas relief on this ground should be denied.

> **D.    The SJC's Determination That The Trial Court Properly Excluded Petitioner's Proferred Expert Testimony Concerning the Effects Of Long-Term Marijuana Use Did Not Run Afoul of Petitioner's Right to Present a Defense.**

Given the relevant Supreme Court precedent that governs a criminal defendant's federal

constitutional right to present evidence in his defense at trial, the petitioner provides this Court

with no basis to grant habeas relief with his claim that his Sixth Amendment rights were violated

by the state court's exclusion of expert testimony proferred by the petitioner.  *See* Petitioner's

Memorandum in Support of Petition, at 27-30.  The Supreme Court in recent years has made it

quite clear that a criminal defendant's right to present relevant evidence is not unlimited.  Rather,

the right is subject to "reasonable restrictions" including the "familiar and unquestionably

constitutional evidentiary rules [that] authorize the exclusion of relevant evidence." *Montana v.

Egelhoff*, 518 U.S. 37, 42 (1996); *see United States v. Scheffer*, 523 U.S. 303, 308 (1998) (right

to present evidence limited by reasonable restrictions).  As the Court has noted, "the proposition

that the Due Process clause guarantees the right to introduce all relevant evidence is simply

indefensible." *Montana v. Egelhoff*, 518 U.S. at 42.  Instead,

> state and federal rulemakers have broad latitude under the Constitution to
> establish rules excluding evidence from criminal trials.  Such rules do not abridge
> an accused's right to present a defense so long as they are not "arbitrary" or
> "disproportionate to the purposes they are designed to serve."

*United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)).

The state's interest in ensuring that only reliable evidence is presented to the trier of fact in a

criminal trial is owed great deference under this analysis.  *See id.* at 308-09 (recognizing state's

interest in enforcing evidentiary rules that ensure reliability of evidence presented in criminal

trials); *Montana v. Egelhoff*, 518 U.S. at 42 (criminal defendant has no right to "'offer [evidence]

that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence'").

Indeed, as the Supreme Court has noted, it has "never questioned the power of States to exclude

evidence through the application of evidentiary rules that themselves serve the interests of

fairness and reliability -- even if the defendant would prefer to see that evidence admitted."

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *see Marshall v. Lonberger*, 459 U.S. 422, 438 n.6

(1983)("the Due Process Clause does not permit the federal courts to engage in a finely tuned

review of the wisdom of state evidentiary rules"); *Rock v. Arkansas*, 483 U.S. at 55 (right to

present evidence must "bow to accommodate other legitimate interests in the criminal trial

process").  Further, the Supreme Court has pointed out that its decision in *Chambers v.

Mississippi*, 410 U.S. 285 (1975) is consistent with this analytical framework and its holding

represented nothing more than "an exercise in highly case-specific error correction."  *Montana v.

Egelhoff*, 518 U.S. at 52.

The petitioner claims that he should have been allowed to introduce an expert who could testify about the long-term effect of marijuana use on a person's ability to "perceive, remember, and articulate accurately."  *See* Petitioner's Memorandum at page 28.  Specifically, petitioner sought to use this testimony to impeach a Commonwealth witness, Laura White, who testified to a number of events she witnessed in the Perry home.  Because the state trial court used a familiar and constitutional evidentiary rule to exclude the testimony, the petitioner has not made out a claim rising to the level of a constitutional violation.  *See United States v. Scheffer*, 523 U.S. at 308 (state evidentiary rules excluding relevant, but unreliable, evidence do not abridge right to present a defense "so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve'"); *Montana v. Egelhoff*, 518 U.S. at 53 (criminal defendant enjoys no absolute entitlement to present "crucial, relevant evidence").  As the SJC determined in reviewing this claim:

> The witness testified to having memory difficulties caused by other psychiatric conditions.[8]
>
> "The admission of expert testimony lies in the sound discretion of the trial judge." *Commonwealth v. Jones*, 362 Mass. 497, 501, 287 N.E.2d 599 (1972).  Evidence as to a witness's drug use may not be used to attack a witness's credibility unless the evidence relates to direct observation "of the effect of drug consumption on

---

[8]The SJC added the following in a footnote:

"The witness testified that, due to psychiatric conditions, she had difficulties in sequencing events chronologically and had undergone counselling.  The records reviewed by the defense expert support this testimony.  Her psychiatric records listed these conditions as posttraumatic stress disorder and depression.  The judge conducted proceedings in accord with our decision in *Commonwealth v. Bishop*, 416 Mass. 169, 617 N.E.2d 990 (1993), and ordered the witness's psychiatric records turned over to the defendant.  The defense expert was permitted to testify that individuals with disorders like those of the witness might suffer from 'major impairments in memory and integration of attention and perception.'"

> [the witness's] capacity to perceive or recall" (emphasis added). *Commonwealth v. Arce*, 426 Mass. 601, 604, 690 N.E.2d 806 (1998). Here, the expert witness never observed directly the condition his proposed testimony was to describe. Nor was there any evidence that the witness in fact suffered from such a condition.
>
> In these circumstances, the proferred testimony would have served as expert commentary on the witness's credibility. "[A]n expert 'may not offer an opinion on a witness's credibility.'" *Commonwealth v. McIntyre*, 430 Mass. 529, 538, 721 N.E.2d 911 (1999), quoting *Commonwealth v. Ianello*, 401 Mass. 197, 202, 515 N.E.2d 1181 (1987). *See United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997). Credibility of witnesses is for the jury to decide. *See id.* Given the absence of evidence linking the witness's memory difficulties to her drug use, such expert testimony should not have been allowed.

*Commonwealth v. Perry*, 432 Mass. at 237, 733 N.E.2d at 103. This analysis, which employed familiar rules of Massachusetts evidence and relied upon the bedrock principle that juries decide issues of credibility, is fully consonant with the applicable Supreme Court precedent. As the SJC noted, the petitioner was able to cross examine Ms. White fully as to her ability to "perceive, remember, and articulate accurately." He had access to her psychiatric records, which provided fodder for his expert's testimony about the effect of her diagnosed conditions on her memory. Furthermore, she testified as to her drug use, which permitted defense counsel to cross examine her on that issue as well. As the SJC noted, admission of the expert testimony petitioner sought to adduce would have impinged upon the jury's function, a result not countenanced by applicable Supreme Court precedent, which has held that appropriate evidentiary rules:

> serve...a legitimate governmental interest: Preserving the jury's core function of making credibility determinations in criminal trials. A fundamental premise of our criminal trial system is that "the jury is the lie detector."

*United States v. Scheffer*, 523 U.S. at 312-13 (quoting *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) (upholding appropriateness of Military Rule of Evidence 707, which

excludes from admission at military trials the results of polygraph examinations).  The habeas

petition should be denied on this ground.

> **E.    The State Courts' Determination That Appellate Counsel Was Not Ineffective Neither Contravened, Nor Unreasonably Applied, Extant <u>Supreme Court Law</u>.**

The petitioner's claim that appellate counsel was ineffective for failing to raise either trial

counsel's ineffectiveness or the denial of his motion to suppress physical evidence necessarily

fails when one considers the state courts' resolution of this claim.  *See* Petitioner's Memorandum

in Support of Petition, at pages 44-45; Supp. Ans., I, O.  The motion judge, who first considered

petitioner's claim, remarked that appellate counsel was "a highly skilled, experienced and

effective appellate advocate."  *See* Supp. Ans., I, at page 2.  After setting forth the correct

standard governing an ineffective assistance of appellate counsel claim, quoting *Jones v. Barnes*,

463 U.S. 745 (1983) and *Smith v. Murray*, 477 U.S. 527 (1986), the motion judge determined:

> My review of the opinion of the Supreme Judicial Court reveals that appellate counsel raised a number of appropriate issues and supported them with plausible arguments.  The issues which he did not raise, and which the defendant now faults him for not raising, clearly stood a significantly lesser chance of success on the merits, and therefore appellate counsel cannot be faulted for failing to raise them. The defendant has made no showing that appellate counsel failed to raise a significant and obvious issue which may have resulted in a reversal of the conviction or an order for a new trial.

*See* Supp. Ans., I, at page 3.  Next, the single justice, acting as gatekeeper, stated the following

after determining that petitioner's ineffective assistance of *trial* counsel claims presented no

substantial risk of a miscarriage of justice:  "Where none of these claimed errors by trial counsel

produced a substantial risk of a miscarriage of justice, the defendant cannot prevail here by

asserting that appellate counsel was ineffective.  [Citation omitted.]  The challenge of appellate

counsel 'is not to identify every plausible argument but rather to argue those issues which are

28

most likely to be resolved in favor of one's client.' *Commonwealth v. Sowell*, 34 Mass. App. Ct. 229, 233 (1993), and cases cited." *See* Supp. Ans., O, at page 3.

      Where the state court was well aware of, and quoted, the appropriate standard governing ineffective assistance of appellate counsel claims and where it was not presented with facts "materially indistinguishable" from those present in a relevant Supreme Court case, the petitioner cannot demonstrate a basis for relief under the "contrary to" prong of the AEDPA. *See Smiley v. Maloney*, 422 F.3d 17, 20 (1st Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. at 405, 406). Additionally, given the state court's appropriate conclusion, based upon its review of the SJC's decision, that skilled appellate counsel raised the issues that were most likely to assist petitioner, he cannot satisfy the "unreasonable application" prong. Such a conclusion cannot be considered objectively unreasonable when one simply reviews the 70-page brief counsel filed with the SJC, which raised six categories of legal claims. *See* Supp. Ans., B. As review of the brief demonstrates, counsel carefully chose those issues, given the facts and circumstances of the petitioner's case, which were most pertinent. The motion judge appropriately made use of the Supreme Court's teachings in this area in denying the petitioner's motion for a new trial: "'[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.' *Smith v. Murray*, 477 U.S. 527, 536 (1986), quoting from *Jones v. Barnes*, [463 U.S.] at 751." *See* Supp. Ans., I, at page 3. Habeas relief on this ground should be denied.

II.   **THE PETITIONER'S PROCEDURAL DEFAULT OF HIS REMAINING CLAIMS RENDER THEM UNAVAILABLE FOR HABEAS REVIEW, AS THERE EXISTS NEITHER CAUSE AND PREJUDICE NOR ACTUAL INNOCENCE TO EXCUSE THE DEFAULTS.**

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial.  Rather, the remedy is limited to the consideration of federal constitutional claims."  *Burks v. DuBois*, 55 F.3d 712, 715 (1st Cir. 1995); *see Herrera v. Collins*, 506 U.S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is to ensure that individuals are not imprisoned in violation of the Constitution); *see also Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials").  Thus, federal habeas review is precluded, as a general proposition, when a state court has reached its decision on the basis of an adequate and independent state-law ground.  *See Coleman v. Thompson*, 501 U.S. 722 (1991).  In *Coleman*, the Supreme Court held that where:

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id*. at 750.  A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the rule and has not waived it.  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Burks v. DuBois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d 1197, 1199 (1st Cir. 1987), *cert. denied*, 485 U.S. 990 (1988).  Because the petitioner failed to raise virtually all of the claims stated in his motion for a new trial at the earliest opportunity, the claims are in procedural default based upon longstanding rules of Massachusetts procedure.

The petitioner filed a motion for a new trial within a few months after the SJC affirmed his convictions. Along with reiterating several claims already rejected by the SJC, he included a number of newly minted claims that he presents to this Court as well: (1) ineffective assistance of trial counsel for (a) failing to call two witnesses who would have assisted petitioner's defense (not separately stated in Habeas Petition but argued in Petitioner's Memorandum in Support of Petition, at pages 38-40), (b) compelling petitioner to testify in violation of his right not to incriminate himself (Ground 11 of Habeas Petition), (b) failing to request an instruction on juror unanimity (Ground 12 of Habeas Petition, and (c) failure to raise petitioner's right to make a telephone call in his motion to suppress (Ground 13 of Habeas Petition); (2) ineffective assistance of appellate counsel for failing to raise either trial counsel's alleged ineffectiveness or the denial of petitioner's motion to suppress physical evidence (Ground 15 of Habeas Petition); (3) right to a fair trial violated by denial of petitioner's motion to suppress physical evidence (not separately stated in Habeas Petition, but argued in Petitioner's Memorandum in Support of Petition, at pages 48-51); (4) prosecutorial misconduct in closing argument (not separately stated in Habeas Petition, but argued in Petitioner's Memorandum in Support of Petition, at pages 51-53); (5) reversible error in trial court's denial of motion for mistrial and dismissal (Ground 16 of Habeas Petition); (6) insufficiency of the bill of particulars as to particular dates and times when crime was committed (Ground 14 of Habeas Petition (but now converted into an ineffective assistance claim)); and (7) violation of right to impartial jury by trial court's failure to dismiss for cause two venire persons who allegedly wandered into the lockup area (Ground 17 of Habeas Petition). *See* Supp. Ans., H.

The motion judge (Ford, J.)[9] denied the motion for a new trial, specifically refusing to

reach the merits of all claims, save the ineffective assistance of appellate counsel claim, due to

petitioner's waiver:

> I have carefully reviewed the [petitioner's] motion along with the attachments to
> it, as well as the opinion of the Supreme Judicial Court.  I find that many of the
> issues argued by the [petitioner] in his motion either were raised or could have
> been raised (including some aspects of the alleged ineffectiveness of trial counsel)
> in the direct appeal.  As to all of these, **I hereby apply the familiar waiver
> principles of *Commonwealth v. Watson*, 409 Mass. 110, 112 (1991) and
> *Commonwealth v. Hrycenko*, 417 Mass. 309, 312 (1994).**  I understand that I do
> have the discretion to rehear these questions, but I do not believe this to be that
> type of "extraordinary case" where, upon sober reflection, it appears that a
> miscarriage of justice might otherwise result.  *See Commonwealth v. Harrington*,
> 379 Mass. 446, 449 (1980).

*See* Supp. Ans., I (emphasis added).  The "familiar waiver principles" to which the trial court

referred are well established both by Massachusetts common law and its rule governing motions

for a new trial, Massachusetts Rule of Criminal Procedure 30.  Specifically, a criminal defendant

is obliged to bring all available legal claims to the state courts' attention at the earliest available

opportunity.  As the SJC has opined:

> If a defendant fails to raise a claim that is generally known and available at the
> time of trial or direct appeal or in the first motion for postconviction relief, the
> claim is waived.  [Citations omitted.]  This requirement is critical to achieve
> finality in the litigation of criminal cases and to assure that limited judicial
> resources are not consumed by claims that should have been raised earlier.

*Rodwell v. Commonwealth*, 432 Mass. 1016, 1018, 732 N.E.2d 287, 289 (2000); *see*

*Commonwealth v. Mahar*, 442 Mass. 11, 13 & n.4, 809 N.E.2d 989, 992 & n.4 (2004) (grounds

for postconviction motions for new trial are waived if they are available, but not raised, on direct

---

[9]The trial judge had retired by the time that petitioner filed his motion for a new trial.  *See*
Supp. Ans., I ("Because the trial judge (Welch, J.) has retired, the matter was assigned to me....").

appeal).  If a defendant fails to do so, the claim is waived and will be reviewed only to determine

whether it raises the risk of a miscarriage of justice.  *Commonwealth v. Randolph*, 438 Mass. 290,

294-96, 780 N.E.2d 58, 64-65 (2002).  Where the petitioner had new counsel for his appeal, he

was expected to bring to the SJC, on direct appeal, all claims of trial error, as well as claims of

ineffective assistance of trial counsel.  *Cf. Commonwealth v. Lanoue*, 409 Mass. 1, 3-4, 563

N.E.2d 1367, 1369 (1990) (no waiver of ineffective assistance claim on direct appeall where

defendant represented by same counsel at trial and on appeal).  His failure to raise on direct

appeal the claims stated in his motion for a new trial (with the exception of ineffective assistance

of appellate counsel, the merits of which respondent has briefed *supra* at pp.27-29) constituted a

default of long-established Massachusetts procedural rules and effectively barred consideration

of those claims.

     As he was required to do, petitioner filed an application with the single justice of the SJC

seeking leave to appeal Judge Ford's decision denying his motion for a new trial.  As a matter of

Massachusetts appellate procedural law, there exist special provisions for those indicted for, and

convicted of, first-degree murder.  Under G.L. c. 278, § 33E, such a "capital" defendant has a

right of direct appeal to the SJC, without the case being first entered on the docket of the Appeals

Court.  *See Dickerson v. Latessa*, 872 F.2d 1116, 1117-18 (1st Cir. 1989).  The scope of the SJC's

review is exceedingly broad under section 33E:  it reviews the "whole case" to determine

whether the verdict is against the weight of the evidence, and the court is empowered to order a

new trial or to reduce the verdict to a lesser degree of guilt if the interests of justice so require.

*Id.*; *see Trigones v. Attorney General*, 420 Mass. 859, 863, 652 N.E.2d 893, 895 (1995); 32

Nolan & Sartorio, Massachusetts Practice Series, Criminal Law, § 189 (3d ed. 2001).

After this plenary review on direct appeal, a capital defendant may not appeal the decision of the Superior Court denying a post-appeal motion for a new trial unless the "gatekeeper," *i.e.*, a single justice of the Supreme Judicial Court for Suffolk County, finds that the appeal presents a "new" and "substantial" question which ought to be determined by the full court. *Dickerson v. Latessa*, 872 F.2d at 1118. The gatekeeper's denial of a defendant's petition for leave to appeal is final and unreviewable. *Commonwealth v. Ambers*, 397 Mass. 705, 710-11, 493 N.E.2d 837, 841 (1986); *see McLaughlin v. Gabriel*, 726 F.2d 7, 9 (1st Cir. 1984). The gatekeeper only reviews the defendant's claims to determine whether they meet the conjunctive procedural requirement that they be both "new" and "substantial." *Leaster v. Commonwealth*, 385 Mass. 547, 549-50, 432 N.E.2d 708, 709-10 (1982); *see Dickerson v. Latessa*, 872 F.2d at 1118; *McLaughlin v. Gabriel*, 726 F.2d at 9.

The gatekeeper denied petitioner's application for leave to appeal, noting that the legal claims stated therein "fail[ed] to present any 'new and substantial question' warranting leave to appeal." *See* Supp. Ans., O, at page 2. Although the gatekeeper also noted the petitioner's waiver of his ineffective assistance of trial counsel claims, so that the claims were not "new" for purposes of a possible appeal, he did review their substance only to determine whether they presented a substantial risk of a miscarriage of justice. *Cf. Phoenix v. Matesanz*, 189 F.3d 20, 25-27 (1st Cir. 1999) (gatekeeper's decision does not itself constitute a procedural default when gatekeeper bypasses question of whether the claim is "new" and simply denies claim as "unsubstantial"). This lowered standard of review did not waive the trial court's invocation of Massachusetts' waiver principles. *See Horton v. Allen*, 370 F.3d 75, 81 (1st Cir. 2004) (SJC's review of unobjected to error for substantial risk of miscarriage of justice "does not work a

34

waiver of the contemporaneous objection requirement") (citing *Gunter v. Maloney*, 291 F.3d 74, 79-80 (1st Cir. 2002); *Burks v. DuBois*, 55 F.3d 712, 716 (1st Cir. 1995); *Tart v. Massachusetts*, 949 F.2d 490, 496 (1st Cir. 1991); *Puleio v. Vose*, 830 F.2d 1197, 1200 (1st Cir. 1987)), *cert. denied*, 125 S. Ct. 971 (2005).

To overcome his procedural default to permit federal habeas review of his many procedurally defaulted claims, the petitioner must demonstrate either (1) cause and prejudice for the default, or (2) a failure to review the claim will result in a "fundamental miscarriage of justice," *i.e.*, the conviction of an innocent person. *Coleman v. Thompson*, 501 U.S. at 750. In this case, the petitioner cannot demonstrate either. To establish "cause," a habeas petitioner "must show 'that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Horton*, 370 F.3d at 81 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). While demonstrating that counsel was constitutionally ineffective is a valid method for establishing cause, *see id.* (citations omitted), an ineffective assistance of counsel claim that is itself procedurally defaulted cannot suffice as cause. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). As the First Circuit has explained it, "[a]dequate 'cause' cannot rest upon a ground that has itself been procedurally defaulted, at least without identifying some additional adequate cause to justify that default." *Lattimore v. DuBois*, 311 F.3d 46, 55 (1st Cir. 2002) (citing *Edwards v. Carpenter*, 529 U.S. 446 (2000)). Because petitioner cannot demonstrate adequate "cause" for his procedural default, habeas review of these claims is precluded.

Even if the petitioner could demonstrate "cause" for his defaults, he cannot demonstrate that he would suffer the genre of prejudice required to excuse those defaults, namely, that the

alleged errors "infect[ed] his entire trial with error of constitutional dimensions." *Ortiz v. DuBois*, 19 F.3d 708, 714 (1st Cir. 1994), *cert. denied*, 513 U.S. 1085 (1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  As the single justice noted in denying petitioner's application for leave to appeal the denial of his motion for a new trial, none of his ineffective assistance claims raised a substantial risk of a miscarriage of justice:

> First, trial counsel's decision not to have particular witnesses testify, witnesses known to counsel and interviewed by her or her investigators, does not lead me to conclude that counsel failed to prepare, and adequately execute, a reasonable trial strategy. [Citations omitted.] Second, the defendant has presented no support for his assertion that trial counsel "forced" him to testify in his own defense apart from his own "verified" statement to that effect in his motion for a new trial. Third, the fact that the full court has already reviewed and rejected the defendant's claim that the Commonwealth's evidence on the charge of murder in the first degree was insufficient under theories of both join and individual liability, and has concluded that the defendant's multiple acts of abuse of the victim had the cumulative effect of causing his death, negates any basis for a unanimity instruction as to specific acts. [Citations omitted.] Fourth, the full court has already reviewed and rejected the defendant's argument that he was erroneously denied his right to use the telephone under G.L. c. 276, s. 33A. [Citation omitted]

Supp. Ans., O, at page 2-3.  Likewise, given the overwhelming evidence presented against him, which evidence included his own confession to the acts that proximately caused the victim's death, as well as the testimony of a number of individuals who witnessed petitioner's actions, the remaining procedurally defaulted claims do not raise even a hint that petitioner's entire trial was "infected" with error of constitutional dimension.[10]

---

[10]It is worth noting that the petitioner failed to exhaust one of these procedurally defaulted claims.  The petitioner did not present his prosecutorial misconduct claim as a violation of Due Process in state court.  *See* Supp. Ans., L, at pages 41-43.  Because the petitioner has not demonstrated "cause" for this defaulted claim, the respondent will not further address the question of exhaustion.  It is also worth noting that, even assuming that petitioner could scale the procedural default hurdle to consideration of his motion to suppress physical evidence claim, he would need to scale the nearly insurmountable hurdle of *Stone v. Powell*, 428 U.S. 465 (1976), which makes habeas review of such Fourth Amendment claims virtually nonexistent.

Finally, the petitioner could make no demonstration to this habeas court that he actually is innocent. "To establish actual innocence, 'petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Simpson v. Matesanz*, 175 F.3d 200, 210 (1ˢᵗ Cir. 1999) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citations omitted)), *cert. denied*, 528 U.S. 1082 (2000)). The Commonwealth produced overwhelming evidence of the petitioner's guilt, including his voluntary confession, to gruesome acts committed over a long period of time which inexorably caused the victim's death. As such, this "quite narrow and seldom used" exception to the procedural default doctrine simply does not apply to this case and habeas review is barred. *Simpson v. Matesanz*, 175 F.3d at 210.

## CONCLUSION

For all the foregoing reasons, the respondent respectfully requests that the habeas petition be denied.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL


/s/ Cathryn A. Neaves
Cathryn A. Neaves
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200 ext. 2557
BBO No. 556798

Dated:  January 13, 2006

## CERTIFICATE OF SERVICE

  I hereby certify that I served a true copy of the foregoing on January 13, 2006, by placing it in the office depository for collection and delivery via first-class mail, postage pre-paid, to petitioner as follows:  Frederick Perry, MCI-Norfolk, 2 Clark Street, P.O. Box 43, Norfolk, Massachusetts  02056.


/s/ Cathryn A. Neaves
Cathryn A. Neaves

38